Record No. 17-1132

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

SINAN RAYYAN,

*Plaintiff - Appellant,*

*v.*

VIRGINIA DEPARTMENT OF TRANSPORTATION,

*Defendant - Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION
_____

BRIEF OF APPELLEE
_____

**MARK R. HERRING**
Attorney General of Virginia

**SAMUEL T. TOWELL**
Deputy Attorney General

**LIZA S. SIMMONS (VSB No. 67550)**
Assistant Attorney General
Office of the Attorney General
202 N. Ninth Street
Richmond, Virginia  23219
(804) 371-2265
(804) 371-2087 (fax)
lsimmons@oag.state.va.us

*Counsel for Defendant-Appellee*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __17-1132__     Caption: __Sinan Rayyan v. Virginia Department of Transportation__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Virginia Department of Transportation__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                            ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?                                               ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: ___February 10, 2017___

Counsel for: __VDOT, Appellee_____

## CERTIFICATE OF SERVICE
****************************

I certify that on ___February 10, 2017___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Dirk McClanahan
McClanahan Powers, PLLC
8133 Leesburg Pike, Suite 130
Vienna, VA 22182

_____              ___February 10, 2017___
(signature)                                      (date)

- 2 -

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

INTRODUCTION ....................................................................... 1

STATEMENT OF THE ISSUES ................................................. 1

STATEMENT OF THE CASE ..................................................... 2

I.      Statement of Facts ............................................................. 2

         A.     Rayyan's Position at VDOT ...................................... 3

         B.     VDOT's Review Policy ............................................. 7

         C.     Rayyan's Vague Claim of Discrimination .............. 8

         D.     Rayyan's Re-Evaluation and Termination .............. 9

II.     Procedural History ........................................................... 10

SUMMARY OF ARGUMENT ................................................... 12

STANDARD OF REVIEW ........................................................ 13

ARGUMENT ............................................................................. 14

I.      The District Court properly granted summary judgment on
        Rayyan's Title VII claims for race and religion discrimination .............. 14

         A.     The District Court properly concluded that Rayyan had
              not presented direct evidence of discrimination. ............... 14

         B.     The District Court properly concluded Rayyan could not
              state a *prima facie* case of race discrimination. .................. 19

              1.     Rayyan cannot demonstrate his job performance
                    was satisfactory. ............................................. 19

              2.     Rayyan cannot show that similarly situated
                    employees outside the protected class received
                    more favorable treatment. ................................ 22

C.    The District Court properly concluded Rayyan could not state a *prima facie* case of religious discrimination. ........................... 24

D.    The District Court properly ruled that VDOT provided evidence demonstrating it had a legitimate reason for its adverse decision. ........................................................................ 25

II.    The District Court properly granted summary judgment on Rayyan's Title VII claim for retaliation. ....................................... 28

III.    The District Court was not required to "treat as true the facts alleged by Plaintiff-Appellant Rayyan". ......................................... 31

CONCLUSION ......................................................................................... 31

STATEMENT REGARDING ORAL ARGUMENT ............................................. 32

CERTIFICATE OF COMPLIANCE ............................................................. 32

CERTIFICATE FILING AND SERVICE ......................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ......................................................... 13, 31

*Autry v. N.C. Dep't of Human Res.*,
820 F.2d 1384 (4th Cir. 1987) ............................................26

*Birkbeck v. Marvel Lighting Corp.*,
30 F.3d 507 (4th Cir.1994) ............................................ 15, 16

*Bizzell v. Sprint/United Mgmt. Co.*,
No. 1:12cv00075, 2014 U.S. Dist. LEXIS 38851
(W.D. Va. Mar. 25, 2014) ..................................................27

*Bonds v. Leavitt*,
629 F.3d 369 (4th Cir. 2011) ..............................................13

*Brinkley v. Harbour Recreation Club*,
180 F.3d 598 (4th Cir. 1999) ..............................................14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..........................................................13

*Chalmers v. Tulon Co.*,
101 F.3d 1012 (4th Cir. 1996) ........................................ 24, 25

*Coleman v. Md. Ct. of Appeals*,
626 F.3d 187 (4th Cir. 2010) ..............................................19

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003) ............................................................14

*Evans v. Techs. Applications & Serv. Co.*,
80 F.3d 954 (4th Cir. 1996) ........................................... 14, 27

*Haywood v. Locke*,
387 F. App'x 355 (4th Cir. 2010) ................................... 22, 23

*Holland v. Wash. Homes, Inc.*,
487 F.3d 208 (4th Cir. 2007) ......................................... 26, 28

iii

*JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*,
    264 F.3d 459 (4th Cir. 2001) ...............................................................13

*King v. Rumsfeld*,
    328 F.3d 145 (4th Cir. 2003) ......................................................... 28, 30

*Laughlin v. Metro. Wash. Airports Auth.*,
    149 F.3d 253 (4th Cir. 1998) ..............................................................29

*Lawrence v. Mars, Inc.*,
    955 F.2d 902 (4th Cir. 1992) ..............................................................24

*Lightner v. City of Wilmington, N.C.*,
    545 F.3d 260 (4th Cir. 2008) ..............................................................26

*Mackey v. Shalala*,
    360 F.3d 463 (4th Cir. 2004) ..............................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .............................................................................14

*Matvia v. Bald Head Island Mgmt.*,
    259 F.3d 261 (4th Cir. 2001) ..............................................................26

*McCray v. Pee Dee Reg'l Transp. Auth.*,
    263 F. App'x 301 (4th Cir. 2008) ................................................. 14, 16

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .............................................................................25

*Mereish v. Walker*,
    359 F. 3d 330 (4th Cir. 2004) ..............................................................26

*Mitchell v. Toledo Hosp.*,
    964 F.2d 577 (6th Cir. 1992) ..............................................................23

*Perry v. Kappos*,
    489 F. App'x 637 (4th Cir. 2012) ........................................................16

*Proud v. Stone*,
    945 F.2d 796 (4th Cir. 1991) ..............................................................18

iv

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)..................................................................................26

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)..................................................................................25

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*,
133 S. Ct. 2517 (U.S. 2013).......................................................................30

*Zipes v. Trans. World Airlines, Inc.*,
455 U.S. 385 (1982)..................................................................................16

**Statutes**

42 U.S.C. § 1981 *et seq*..........................................................................1, 10

42 U.S.C. § 2000e *et seq.*.........................................................................1, 2

42 U.S.C. § 2000e-3 ..............................................................................11, 28

**Rules**

Fed. R. Civ. P. 56(c).................................................................................13

**INTRODUCTION**

This case arises from Sinan Rayyan's employment at Virginia Department of Transportation ("VDOT") Fredericksburg Project Management Office ("PMO"). Rayyan received four probationary progress reviews during his first year of employment and while each review rated him as a "Contributor" it also identified areas that needed improvement. Rayyan subsequently received numerous performance documents addressing areas of deficiency and he was rated as a "Below Contributor" in his 2013 performance evaluation. VDOT terminated his employment after his performance failed to improve during his re-evaluation period.

Rayyan filed a civil action against his former employer alleging (1) discrimination in violation of 42 U.S.C. § 1981 *et seq.*; (2) race and religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (3) retaliation under Title VII. Following discovery, the District Court granted the Defendant's motion for summary judgment on all counts. Rayyan noted his appeal on January 30, 2017.

**STATEMENT OF THE ISSUES**

1. Whether the district court erred in concluding on summary judgment that plaintiff-appellant Rayyan failed to state a claim for racial discrimination under 42 U.S.C. § 2000e *et seq.*?

1

2.  Whether the district court erred in concluding on summary judgment that plaintiff-appellant Rayyan failed to state a claim for religious discrimination under 42 U.S.C. § 2000e *et seq.*?

3.  Whether the district court erred in concluding on summary judgment that plaintiff-appellant Rayyan failed to state a claim for retaliation under 42 U.S.C. § 2000e *et seq.*?

4.  Whether the district court erred when it concluded that Rayyan had not presented evidence of a genuine dispute as to any material fact for racial discrimination, religious discrimination, or retaliation under 42 U.S.C. § 2000e *et seq.*?

5.  Whether the district court erred in entering summary judgment when it failed to treat as true the facts alleged by plaintiff-appellant Rayyan?

## STATEMENT OF THE CASE

### I.    Statement of Facts

Rayyan is a licensed professional engineer who speaks and writes English fluently.  J.A. 33, 81-82.  He began his employment with the Virginia Department of Transportation ("VDOT") Fredericksburg Project Management Office ("PMO") in January 2012 as an Engineer Senior Project Manager.  J.A. 83.  On April 22, 2013, Rayyan's working title changed to Engineer Senior Supervisor Project Manager, effective April 25, 2013.  J.A. 35.

2

### A. Rayyan's Position at VDOT

For the majority of Rayyan's employment, his direct supervisor was Kevin Northridge, who is Caucasian. J.A. 35, 38. Northridge reported directly to Michelle Shropshire, who is also Caucasian. J.A. 34, 38. During the time in question, Shropshire reported to the District Administrator, Quintin Elliott, who is African-American. J.A. 38, 201-02. Elliott left the Fredericksburg District in January 2014. J.A. 34, 159. Shropshire was Rayyan's superior throughout his employment, and she directly supervised him from December 4, 2013, when Northridge resigned, until January 30, 2014. J.A. 34, 37, 114. Shropshire, Northridge, and Rayyan were the only licensed engineers in the PMO. J.A. 33, 53, 142.

Rayyan signed two separate VDOT Employee Work Profiles ("EWP") during his employment. J.A. 34, 211, 217. The purpose of his position was described in Section 20 of both EWPs. *See* J.A. 211, 217. Section 23 identified Rayyan's Core Responsibilities and Section 24 identified the Measures for Core Responsibilities. J.A. 34, 212, 218. Pursuant to his EWPs, he was responsible for ensuring that projects were developed and ready for advertisement and for construction. J.A. 162.

Rayyan was the only VDOT employee in the PMO with the title of Senior Project Manager/Supervisor, the only Project Manager at his level that supervised

3

project managers that handed small VDOT projects, and his position required a professional engineer's license. J.A. 34, 203. As of March 1, 2012, Rayyan had two direct reports, Daniel Harrison and Robert Strevell. *Id.* Strevell transferred in September of 2013. J.A. 35. Rene Harris began working at VDOT on January 10, 2014. J.A. 184-85. Harris reported to Rayyan for twenty days until January 30, 2016, when Shropshire became Harris's immediate supervisor. J.A. 185-87.

During Rayyan's employment he was subject to certain performance assessments. Before Northridge resigned he prepared Rayyan's performance assessments, and Shropshire was charged with reviewing the assessments and discussing them with Northridge. J.A. 118-27. In fact, Shropshire reviewed all the performance documents Northridge prepared for each employee and often suggested changes to incorporate. J.A. 128.

Indeed, Shropshire took an active role in these performance assessments because her boss, Elliott, required it. J.A. 153-54. Elliott met with all the project managers whenever a project was scheduled for advertisement. J.A. 164-65. The project managers, including Rayyan, were required to present and discuss their projects before Elliott would sign any documents. J.A. 163. Elliott reviewed the documents in the package and made sure they were clear and could be understood. J.A. 163. Elliott questioned the project managers about their projects to ensure that they were familiar with them and understood them. J.A. 166. Additionally, Elliott

4

conducted monthly project meetings where all project managers had to provide the status of their projects to Shropshire and Elliott.  J.A. 171, 173.  On one occasion, Rayyan was unable to provide the status of a project.  J.A. 166-67.  On another occasion, Rayyan paid to have a consultant come to the meeting to explain the status of the project when he should have been able to explain it himself.  J.A. 166-69.  Believing that this was a performance issue, Elliott made Shropshire aware of his concerns.  J.A. 168-69.  Indeed, Elliott believed Rayyan could not effectively answer questions relating to his projects. J.A. 174.  Elliott directed Shropshire to discuss the performance issues with Rayyan and to work with him to resolve the issues.  J.A. 175.

Shropshire spent a substantial amount of time working with Rayyan to make sure his projects were developed appropriately in order to be advertised.  J.A. 172.  Shropshire even developed and implemented a Project Management School designed to assist Rayyan and in his performance.  J.A. 140-41, 154, 157, 176.

During his first year of employment, Rayyan had a probationary status.  J.A. 35, 230.  In general, his probationary progress reviews identified him as a "Contributor."  Each of the four reviews, however, identified areas wherein Rayyan needed to improve.  *See* J.A. 230, 231, 233, 235.  His October 23, 2012 annual performance evaluation rated him as a "Contributor," but his supervisor noted the same concerns identified during his probationary year and stated that

Rayyan's understanding of the VDOT processes had to improve in the next three months.  J.A. 237.

On March 18, 2013, Northridge issued Rayyan a Notice of Improvement Needed/Substandard Performance.  J.A. 36, 239-40.  Northridge stated that Rayyan "continues to struggle with basic understanding of Department processes, protocols, and systems [sic] which is diminishing his ability to perform his duties as Project Manager and the Small Contracts Supervisor."  *Id.*  The Notice identified three deficient areas—namely, "Project documentation routinely requires editing and clarification"; "Lack of full understanding of processes and procedures"; and "Time Management."  *Id.*  Rayyan submitted an undated written rebuttal to the Notice.  Rayyan addressed the issues raised in the Notice, but he did not claim that the Notice was based on discrimination.  J.A. 110-12.

Subsequent to the Notice of Improvement, Northridge authored and issued three additional written counseling memos to Rayyan.  The April 4, 2013 memo concerned Rayyan's deficiencies with regards to Project UPC 100828.  J.A. 241 The June 3, 2013 memo concerned an incident on May 14, 2013, wherein Rayyan took a document that Shropshire signed, changed the information in the document, and used the signature page without Shropshire's knowledge or approval of the revision.  J.A. 243.  The August 9, 2013 written counseling memo concerned Rayyan's failure to establish intermediate submission deadlines for an I-95 and

6

Route 606 Interchange modification project. J.A. 244. Notably, Shropshire did not sign any of the counseling memos.

In October 2013, Rayyan received an annual performance evaluation rating him as a "Below Contributor." J.A. 246. The 2013 evaluation referenced the prior performance assessments and memos. In addition, Northridge commented that Rayyan failed to properly supervise his direct reports, particularly Strevell. The evaluation cited a number of Strevell's projects that were behind schedule as a result of Rayyan's inadequate guidance. *Id.*

## B.    VDOT's Review Policy

VDOT adheres to the Policies and Procedures Manual adopted by the Department of Human Resource Management ("DHRM"), including DHRM Policy Number: 1.40 – Performance Planning and Evaluation. *See* J.A. 33, 222. Under Policy No. 1.40, a Reviewer is "[t]he supervisor of an employee's immediate supervisor, or another person designated to review an employees work description, performance plan, performance rating and who responds to appeals of performance rating." J.A. 222.

> The reviewer must review the performance plan and performance evaluation sections of the evaluation form before they are presented to the employee. If the reviewer does not agree with the evaluation, the reviewer should discuss the disagreements with the supervisor. The reviewer has the authority to change the employee's evaluation.

7

J.A. 229.  Rayyan was familiar with this process because he also prepared performance documents, including performance evaluations, for his direct reports, and Northridge reviewed his evaluations. J.A. 116.  Likewise, Northridge prepared performance documents, including performance evaluations, for his direct reports, and under DHRM No. 1.40, Shropshire had the authority to review and change any of the documents.  J.A. 229.  Accordingly, Shropshire reviewed performance reports and provided comments where certain areas needed to be strengthened or reinforced.  Northridge indicated that Shropshire made changes to all of the documents he prepared.  J.A. 120.  Notably, in an email dated October 16, 2013 to Human Resources Manager Gregg Eggert, Northridge informed Eggert that he reviewed and concurred with the remarks/edits made by Shropshire regarding Rayyan's October 2013 annual performance evaluation. J.A. 283.  Northridge also testified at his deposition that the comments Shropshire included in the 2013 performance evaluation were not untrue and that she did not do anything wrong. J.A. 125-26.  Northridge merely felt that the performance issues did not warrant the type of discipline that was issued.  *Id*.

### C.  Rayyan's Vague Claim of Discrimination

Rayyan submitted a written rebuttal addressing all the issues in the October 2013 evaluation, but he never raised racial or religious discrimination.  J.A. 113, 249.  On November 22, 2013, he grieved his "Below Contributor" rating, and on

page one of his grievance, Rayyan alleged he was a victim of "discrimination or retaliation by immediate supervisor." J.A. 267. This was the first time he mentioned discrimination or retaliation, and even then he did so generally, without identifying specific comments made by or actions taken by Shropshire. J.A. 102, 103, 195, 267.

In response to Rayyan's grievance, VDOT's Civil Rights Division ("Civil Rights") reviewed his vague claim of discrimination. J.A. 195. On December 12, 2013, Civil Rights closed its review because there was insufficient evidence to support Rayyan's claims. J.A. 196, 269. Specifically, Rayyan could not identify a single allegation relating to any characteristic protected by Title VII. J.A. 109, 195, 269. When deposed, Rayyan admitted that he never told VDOT his race, although he thought it was reflected on his employment application; he never informed VDOT of his religion; and he never informed Shropshire of his race or religion. J.A. 38, 96, 105. He also said Shropshire never asked him about his race, and he never asked for any accommodations during his employment with VDOT in order to practice his faith. J.A. 96, 106-07.

## D. Rayyan's Re-Evaluation and Termination

As a result of the October 2013 evaluation, Rayyan was placed on a 90-day performance improvement plan, commencing November 6, 2013. J.A. 264. Northridge was Rayyan's direct supervisor until December 4, 2013 and Shropshire

9

provided direct supervision from that date forward. J.A. 34, 129-32. From February 2013 until October 2013, just before Northridge's resignation, Shropshire had written Northridge up on multiple occasions for performance issues and ranked him as a "Below Contributor." *See* J.A. 285-95. Northridge testified that all of the project managers left the PMO because of Shropshire's micromanagement. J.A. 129, 135-36.

On January 28, 2014, Shropshire and Barbara Epps-Booker, the Senior Human Resources Consultant, met with Rayyan and presented him with his performance Re-Evaluation, which ranked him as "Below Contributor." J.A. 37. As a result of the Re-Evaluation, Rayyan was also given a Due Process Performance Re-Evaluation correspondence that informed him of his termination. J.A. 37, 277. On January 30, 2014, Rayyan met again with Shropshire and Booker, and he submitted a written Rebuttal statement dated January 28, 2014. J.A. 37. In his Rebuttal statement, Rayyan expressed his disagreement with the performance assessment, but he never indicated his belief that his termination was the result of racial or religious discrimination. J.A. 37, 277. VDOT provided Rayyan a formal termination letter at the meeting, effective that day. J.A. 37.

## II.    Procedural History

Rayyan brought this civil action in federal court against VDOT alleging racial discrimination in violation of 42 U.S.C. § 1981 *et seq.* (Count I), race and

religious discrimination (Counts II and IV), and retaliation (Count III), all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3 ("Title VII"). J.A. 6-19. VDOT filed a motion for summary judgment, which was fully briefed and argued before the District Court. J.A. 49-77, 545.

On January 12, 2017, the District Court entered an order granting summary judgment in VDOT's favor, J.A. 601, finding that Rayyan failed to produce evidence of discrimination or retaliation in violation of Title VII. J.A. 594. Specifically, the District Court ruled that the deposition testimony of Rayyan's direct report Daniel Harrison was not direct evidence of racial discrimination, nor were the other occasional, sporadic comments alleged by Rayyan. J.A. 594-95. The Court also ruled that Rayyan failed to present a *prima facie* case of racial discrimination because he could not demonstrate that his job performance was satisfactory or that a similarly situated employee outside the protected class was treated more favorably. J.A. 595-97. Next, the Court ruled that Rayyan could not demonstrate that VDOT retaliated against him because the undisputed evidence showed that Rayyan did not engage in protected activity, and Rayyan could not show a causal connection between any alleged protected activity and his subsequent termination. J.A. 597-98. Finally, the Court ruled that Rayyan could not present direct/indirect evidence of religious discrimination and the only comment he relied on concerning pork was insufficient to infer that his subsequent

11

discharge was a result of religious discrimination. Also, he did not raise this argument to the Equal Employment Opportunity Commission. J.A. 597-99.

## SUMMARY OF ARGUMENT

The District Court properly granted summary judgment on Rayyan's discrimination and retaliation claims. Harrison's deposition testimony does not provide direct evidence of racial discrimination. Likewise, the other alleged comments Rayyan relies on were sporadic and remote and did not rise to the level of actionable comments. More apparent is Rayyan's failure to provide evidence of religious discrimination. Rayyan also cannot establish a *prima facie* case of either race or religion discrimination because he is unable to present evidence that he was performing satisfactorily or that he was terminated because of his race or religion. Indeed, the undisputed evidence shows that VDOT was not even aware of his religion. The District Court also properly found that the evidence showed that VDOT had a legitimate business reason for its decision to terminate Rayyan and Rayyan could not present evidence of pretext. Finally, summary judgment was properly granted on Rayyan's retaliation claim because he did not prove he participated in a protected activity or that he would not have been terminated but for his participation in that protected activity.

On appeal, Rayyan mischaracterizes and misconstrues the evidence to attempt to manufacture a genuine issue of material fact. The Court should reject

12

his arguments.  The District Court carefully reviewed the undisputed evidence and properly granted summary judgment to VDOT on all of Rayyan's claims, and this Court should affirm.

## STANDARD OF REVIEW

This Court reviews the District Court's "grant of summary judgment *de novo*, viewing the facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011) (citation omitted).   Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when the pleadings and evidence show that there is no genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party bearing the burden of proof on an issue at trial must "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A "material fact" is a fact that might affect the outcome of a party's case.  *Id.* at 248; *see also JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

Although Title VII cases require a determination of motive, summary judgment is appropriate in cases in which the plaintiff cannot prevail as a matter of law. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

## ARGUMENT

**I.    The District Court properly granted summary judgment on Rayyan's Title VII claims for race and religion discrimination.**

Rayyan claims that he was treated differently and terminated because of his race (Arab-American) and his religion (Muslim). The District Court properly granted summary judgment to VDOT on Counts II and IV of Rayyan's complaint because no reasonable jury could find an actionable claim as a matter of law based on the undisputed facts in this case.

### A.    The District Court properly concluded that Rayyan had not presented direct evidence of discrimination.

In establishing evidence of discrimination, derogatory remarks may constitute direct evidence only where the remarks were related to the employment decision in question and were not "stray or isolated." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). "While isolated statements can constitute direct evidence of discrimination, the statements must be contemporaneous to the adverse employment action." *McCray v. Pee Dee Reg'l Transp. Auth.*, 263 F. App'x 301, 306 (4th Cir. 2008). Indeed, a plaintiff faces a

14

demanding standard when attempting to demonstrate direct evidence of discrimination using isolated statements. *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (concluding that the statement "there comes a time when we have to make way for younger people" reflected "no more than a fact of life" and was too remote to show age discrimination).

Rayyan contends that two comments were racially motivated:

- in April or May 2012, Shropshire allegedly said, "I don't care where you come from. This behavior may be okay in your country. But this is not how it's done here in America. You don't tell me what to do." J.A. 412-13; and

- around August 2013, at one of their biweekly project management school sessions, Shropshire allegedly mentioned that "this is not how it's done in America." J.A. 415-16.

But these comments are not direct evidence of racial discrimination. These alleged comments do not refer to any particular race. At best they refer to a generalized American ideal or work ethic. Such isolated comments are not sufficient to state a claim. *See Birkbeck*, 30 F.3d at 511-12. Moreover, Rayyan testified that no other comments were made concerning his race and no one witnessed the statements being made. J.A. 95, 103. In fact, Rayyan's own witnesses all testified that they never heard Shropshire make a derogatory remark. J.A. 133-34, 182, 188-90, 192-93, 197. These alleged comments do not refer to any particular "race." At best they refer to a generalized American ideal or work ethic. Such isolated comments are not sufficient to state a claim. *See Birkbeck*, 30 F.3d at 511-12.

15

Likewise, the two alleged comments were not contemporaneous to Rayyan's termination. Rayyan alleged that the first remark was made in April or May 2012. Not only is this remark not contemporaneous, it was allegedly made well outside of Title VII's 300-day limitation period. *Zipes v. Trans. World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Therefore, it cannot support Rayyan's claim of discrimination. The second remark, allegedly made in August 2013, also has no contemporary nexus with Rayyan's termination in January 2014. *See, e.g.*, *Birkbeck*, 30 F.3d at 512 (holding that the remoteness of an employer's statement and the fact that employer made the statement on only one occasion is not appropriate evidence of discrimination.); *see also Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) ("Even a mere ten-week separation between the protected activity and termination is sufficiently long so as to weaken significantly the inference of causation between the two events."). Because Rayyan does not allege discriminatory statements that are "contemporaneous to the adverse employment action," these alleged comments are insufficient to prove discrimination as a matter of law. *McCray v. Pee Dee Reg'l Transp. Auth.*, 263 F. App'x 301, 306 (4th Cir. 2008).

Recognizing that these comments did not rise to direct evidence of discrimination, Rayyan argues that Harrison's testimony provides direct evidence of race discrimination. Appellant's Br. at 7, 17. Rayyan asserts that Shropshire

16

told Harrison on numerous occasions that she "did not want Rayyan to be employed by VDOT because he was a dumb Arab." Appellant's Br. at 8. He states that "[t]hese comments were made within the approximate three-week period preceding his termination." Appellant's Br. at 8. As the District Court recognized, these assertions are simply not supported by the evidence—rather, they are mischaracterizations of Harrison's testimony:

> Harrison's deposition does not clearly support Plaintiff's argument. In fact, in his deposition, Harrison testified that he "didn't hear [Shropshire] make a racist comment." He stated that Shropshire "would refer to the middle east [sic]" when she made the comment about "stupid." From this, Plaintiff argues that Shropshire said Plaintiff was a "dumb Arab."

J.A. 594-95. Clearly, Harrison's testimony does not constitute direct evidence of race discrimination, notwithstanding Rayyan's attempts at manipulation.

Moreover, there is no evidence of the derogatory comments that Rayyan alleges that Shropshire made to Northridge about Rayyan. Northridge testified that he never heard Shropshire make a racist comment. J.A. 133-34. Rayyan testified that sometime after the April 2012 comment was made, he told Northridge he felt like he was being treated differently, but he never explained to Northridge why he thought he was being treated differently. J.A. 97-98. And he never told anyone about any other comments that were allegedly made. J.A. 97-102.

Rayyan offers no evidence of religious discrimination. He testified that at a dinner near Christmas 2012, while he and Shropshire were in a buffet line,

Shropshire allegedly stated, "[d]on't worry, this does not have pork." J.A. 100. This was the only alleged comment that could even be construed as concerning religion. J.A. 104-05. And Rayyan never once mentioned the comment until his deposition. J.A. 103-05. It was therefore never considered by the Equal Employment Opportunity Commission ("EEOC"). Moreover, that alleged comment also occurred outside of the 300-day limitation period and was not contemporaneous with any adverse action.

These unsupported allegations of discrimination further lack plausibility where, as here, Rayyan worked for VDOT for approximately two years, during which time (1) he was hired by and reported to the same management team; (2) he received adequate performance evaluations for approximately one year; (3) the alleged harasser signed off on those performance appraisals; and (4) Rayyan was ultimately terminated by that supervisor. As the Fourth Circuit has noted, this makes it less likely that Rayyan suffered discriminatory animus. *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (Court stated that "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer.") Indeed, if race or religion had been a motivating factor for the termination, it is unlikely that Rayyan would have been provided these opportunities.

### B.    The District Court properly concluded Rayyan could not state a *prima facie* case of race discrimination.

Rayyan also fails to establish a *prima facie* case of discrimination.  To make

out a *prima facie* case of discrimination under Title VII, a plaintiff must show that:

(1) he is a member of a protected class; (2) his job performance was satisfactory;

(3) an adverse employment action was taken against him; and (4) similarly situated

employees outside the protected class received more favorable treatment.  *Coleman*

*v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).    Moreover, "[a]

plaintiff's own self-serving opinions, absent anything more, are insufficient to

establish a *prima facie* case of discrimination."  *Mackey v. Shalala*, 360 F.3d 463,

469-70 (4th Cir. 2004).

Rayyan's Title VII claims fail because he is unable to establish at least two

of the four elements necessary for a *prima facie* disparate treatment case.

### 1.    Rayyan cannot demonstrate his job performance was satisfactory.

First, Rayyan cannot show that he was meeting the performance

expectations of his employer.  Rayyan argues extensively that he was performing

in a satisfactory manner.  Appellant's Br. at 20-23.  To the contrary, the undisputed

record is replete with documentation of Rayyan's performance deficiencies.  J.A.

230-48, 264-66, 270-76.    While he was identified as a "Contributor" on his

probationary evaluations, each of these evaluations identified deficiencies that

Rayyan needed to address.  Over the course of his last year, Rayyan received a Notice of Improvement Needed/Substandard Performance, three separate counseling memos, and two evaluations ranking him as a "Below Contributor."  *Id.* The Due-Process correspondence also identified reasons for VDOT's decision to terminate him.  J.A. 275.  Elliott testified that he had concerns with Rayyan's performance and specifically instructed Shropshire to address these issues, which she tried to do.  J.A. 173-76.  The various performance documents signed by Northridge and Shropshire clearly demonstrate that Rayyan's performance was suffering.

The only evidence of satisfactory performance that Rayyan points to is Northridge's subjective belief, after he left VDOT, that Rayyan was performing up to VDOT's expectations.  But Northridge left VDOT almost two months before the decision to terminate Rayyan was made.  Northridge, who was facing similar performance issues at the time, conceded that Shropshire, his supervisor and reviewer, had the authority to review the performance documents, discuss the documents with him, and suggest or direct that he make changes.  J.A. 126-27. Even now, he acknowledges that Shropshire acted within her authority and that although he may not have agreed with her assessments of Rayyan's performance, she did nothing wrong.  J.A. 125-26.

The undisputed evidence shows that during Rayyan's employment, Northridge authored and issued many of the performance documents to Rayyan, and that to the extent he disagreed with any of Shropshire's recommendations or directives, he never voiced those disagreements or raised any concern to VDOT that he was being improperly influenced or coerced to issue these documents. J.A. 39. Northridge even sent a contemporaneous email to Human Resources that stated that he reviewed and concurred with the remarks and edits Shropshire made on Rayyan's October 2013 performance evaluation. J.A. 283. At the time these decisions were made, Northridge was clearly on board with all of the performance measures taken against Rayyan. For each of these reasons, Rayyan cannot show that he was meeting VDOT's legitimate performance expectations.

Rayyan continues to assert that his performance was measured solely by two metrics: whether the projects were "on time" and "on budget." *See* Appellant's Br. at 21-23. While these may be his preferred measures of performance, the overwhelming and uncontroverted evidence demonstrates that this is just not the case. Rayyan admitted in his deposition that his performance was measured by the criteria set forth in his Employee Work Profile Description/Performance Plans ("EWP"). J.A. 85-86. More importantly, the undisputed evidence establishes that these two metrics, "on time" and "on budget," were used to measure the performance of a *project*, not the performance of a *project manager*. Indeed, they could not

21

measure individual performance because whether the overall project was "on time" and "on budget" would reflect the efforts of the entire team, not one individual.

Even if Rayyan's performance were measured solely by whether the projects he worked on were "on time" and "on budget," which VDOT vigorously denies, winning that argument does not cure his performance deficiencies. The evidence demonstrates that the projects Rayyan worked on were not all completed "on time" and "on budget" as he suggests. The record demonstrates that Rayyan did not complete all his projects on time or on budget. J.A. 520. Rayyan lacks evidence to demonstrate his performance was meeting VDOT's expectations.

> ### 2.    Rayyan cannot show that similarly situated employees outside the protected class received more favorable treatment.

Where "plaintiffs have based their allegations completely upon a comparison to an employee from a non-protected class, and therefore the validity of their prima facie case depends upon whether that comparator is indeed similarly situated . . . . plaintiffs are required to show that they are similar in all relevant respects to their comparator." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citations omitted). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it.'" *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

The District Court properly concluded that Rayyan "was unlike any other employee in the Fredericksburg District." J.A. 596. The other project managers that worked in the PMO, including Kurt Kuppert, were not similarly situated to Rayyan. Rayyan was the only Senior Project Manager that was a licensed engineer (other than Northridge and Shropshire), and Rayyan had supervisory responsibilities. In addition, the project managers that reported to him (Strevell, Harrison, and Harris for about twenty days) only managed small projects while Rayyan managed large projects. The EWPs also demonstrate that the purpose and core responsibilities for his position were different than any other in the office. J.A. 139, 211, 217, 237, 246, 270, 293, 298, 305. Further, Rayyan was responsible for more complex projects than Kuppert. Clearly, his position entailed different responsibilities than that of the other three project managers that reported to Northridge, including Kuppert, who was not a licensed engineer, did not supervise anyone, and was not a Senior Project Manager.

The only project manager that could arguably be considered similarly-situated is Northridge. But the record indicates that Shropshire treated Northridge in similar fashion to Rayyan. For instance, Northridge also received performance documents in 2013, including the Due Process Notice for Potential Disciplinary

23

Action, the Notice of Needs Improvement, a counseling memorandum, a written notice group I, and a performance evaluation ranking him as a "Below Contributor." J.A. 285-97. Northridge admits that Shropshire was not happy with his performance and he recognized that he was one step away from being terminated when he resigned. It is clear that Shropshire treated the only possible similarly situated comparator, Northridge (a Caucasian), in a similar manner to Rayyan.

## C. The District Court properly concluded Rayyan could not state a *prima facie* case of religious discrimination.

The District Court correctly ruled that Rayyan failed to present sufficient evidence of religious discrimination. Notably, Rayyan did not present argument in support of this claim in either his appellant's brief or in his opposition to VDOT's motion for summary judgment, and it is therefore waived. That aside, to prove a disparate treatment theory, "[a] [plaintiff-]employee must demonstrate that the [defendant-]employer treated [him] differently than other employees because of his religious beliefs." *Chalmers v. Tulon Co.*, 101 F.3d 1012, 1017 (4th Cir. 1996). "[A] plaintiff-employee, alleging disparate treatment with respect to [his] discharge, satisfies [his] burden at the summary judgment stage if [he] establishes that [his] job performance was satisfactory and provides 'direct or indirect evidence whose cumulative probative force supports a reasonable inference that [the] discharge was discriminatory.'" *Id.* (quoting *Lawrence v. Mars, Inc.*, 955

24

F.2d 902, 905-06 (4th Cir. 1992)).  If Rayyan is unable to provide direct evidence of discrimination, he could utilize the framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to develop an "inferential case" of religious discrimination.  *Id*.

On the record here and for the reasons stated *supra*, Rayyan fails to meet either of these burdens.  He cannot establish that his job performance was satisfactory at the time of his discharge nor did he present direct or indirect evidence from which a trier of fact could infer religious discrimination.  Rayyan admitted there were no other reasons for his belief that he was being discriminated against based on his religion outside of the 2012 pork comment.  J.A. 104-05. Even if this were an actionable comment, Rayyan never reported it to VDOT management or to the Equal Employment Opportunity Commission.

As Rayyan could not present any direct or indirect evidence of discrimination, the District Court's ruling was proper and should be affirmed.

### D.    The District Court properly ruled that VDOT provided evidence demonstrating it had a legitimate reason for its adverse decision.

Assuming *arguendo* that Rayyan could establish his *prima facie* case, VDOT still articulated a legitimate nondiscriminatory reason for its actions.  This burden is one of production, not persuasion, as the ultimate burden of persuasion always remains with the plaintiff.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see also Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 271 (4th

25

Cir. 2001). VDOT need "merely articulate a justification that is 'legally sufficient to justify a judgment' in [its] favor." *Mereish v. Walker*, 359 F. 3d 330, 335 (4th Cir. 2004). Within this framework, the "remote possibility" of discrimination is insufficient. *Autry v. N.C. Dep't of Human Res.*, 820 F.2d 1384, 1386 (4th Cir. 1987). The burden is on the plaintiff to demonstrate that the stated basis is pretextual. *Id.*

As the Supreme Court stated in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), "[a]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision." *Id.* at 148; *see also Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008).

The record clearly demonstrates that VDOT had non-discriminatory reasons to terminate Rayyan. Rayyan's project documentation routinely required editing and clarification; he lacked a full understanding of VDOT's processes and procedures; and he had issues with time management. He did not effectively move projects forward, he failed to meet intermediate deadlines, and he failed to properly supervise his direct reports, particularly Strevell.

To show pretext, Rayyan had to introduce evidence to show that "the employer's proffered explanation is unworthy of credence." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). He has not done so. Although

Rayyan asserts that he was performing in a satisfactory manner, his opinion regarding his performance does not undermine VDOT's evaluations and is insufficient to prove pretext. *See Bizzell v. Sprint/United Mgmt. Co.*, No. 1:12cv00075, 2014 U.S. Dist. LEXIS 38851, at *11 (W.D. Va. Mar. 25, 2014) ("The overwhelming evidence establishes that Sprint viewed her job performance as unsatisfactory. The plaintiff does offer a self-assessment of her job performance, but her personal opinion alone cannot establish a genuine issue of material fact."); *see also Evans*, 80 F.3d at 960-61 ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (internal quotation marks and citation omitted). Indeed, Rayyan's three supervisors—Elliott, Shropshire and Northridge—all testified to Rayyan's performance issues.

Rayyan attempts to establish satisfactory performance by suggesting that the only real criteria is whether his projects were "on time" and "on budget." But the undisputed evidence undercuts this argument. Indeed, whether a project is "on time" and "on budget" is merely indicative of the team effort, not any one particular individual. J.A. 155-56. The on-time and on-budget metrics were used to measure the performance of a project, not the performance of a project manager. J.A. 155-56, 177-78. The record is clear that the EWPs listed Rayyan's Core Responsibilities and Measures for the Core Responsibilities. J.A. 35, 84-88, 137-38, 143-52.

27

Although he might prefer to be judged on those criteria, Rayyan's preference is irrelevant as well as incorrect. The evidence demonstrates that a percentage of Rayyan's projects were not performed "on time" or "on budget." As a result, even Rayyan's preferred method of evaluation demonstrates that he was not performing up to VDOT's expectations.

## II. The District Court properly granted summary judgment on Rayyan's Title VII claim for retaliation.

The District Court properly ruled that Rayyan "did not engage in protected activity, nor could he establish a causal connection between any protected activity and his subsequent termination." J.A. 597-98. Rayyan argues that the protected act was the December 11, 2013 grievance, the email (undated and never produced in discovery) that he allegedly sent to Booker, and a meeting with Civil Rights. Appellant's Br. at 34.

A *prima facie* case of Title VII retaliation requires a plaintiff to show, by a preponderance of the evidence, that: (1) he engaged in a protected activity; (2) his employer acted adversely against him; and (3) the protected activity and the adverse action were causally connected. *Holland*, 487 F.3d at 218; *King v. Rumsfeld*, 328 F.3d 145, 150-51 (4th Cir. 2003).

To establish that he was engaged in a protected activity, Rayyan had to show that he opposed a prohibited discriminatory practice, or participated or assisted in an investigation or charge of discrimination. 42 U.S.C. § 2000e-3(a). Protected

28

activity "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

Rayyan did **not present any evidence that he** opposed a prohibited discriminatory practice or participated or assisted in an investigation or charge of discrimination. The concerns he discussed with Civil Rights were not prohibited discriminatory practices. Rayyan did not report to Civil Rights the alleged derogatory remarks made by Shropshire in his November 2013 grievance, nor did he report the remarks to Civil Rights during their meeting. Once Civil Rights determined Rayyan did not have any allegations of unlawful discriminatory practices, it closed its review and sent Rayyan correspondence informing him that he did not present any information that indicated "a connection to any protection" as defined in Title VII. J.A. 269. Rayyan did not participate in any investigation or charge of discrimination until *after* he was terminated.

Even if Rayyan could establish a protected activity, he still could not establish a causal connection between the protected activity and his termination. "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the

29

employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). The undisputed record shows that Rayyan was aware of his performance issues long before he alleged discrimination in his November 2013 grievance. Rayyan's supervisor had identified performance issues during Rayyan's probationary year in 2012. Rayyan received three letters of counsel, a notice of needs improvement, a performance evaluation ranking him as "Below Contributor," and a performance re-evaluation plan, all before he filed his first grievance. More importantly, Rayyan was aware before he filed his grievance that he could be terminated if his performance did not improve. Rayyan even conceded that Shropshire's behavior did not change after he raised his claim of discrimination in the November 2013 grievance. J.A. 115. Accordingly, he cannot possibly satisfy the causal nexus required by the Supreme Court in *Nassar*. In addition, Rayyan was not terminated until January 28, 2016, over two months after he filed his first grievance. *King*, 328 F.3d at 151 n.5 (a gap of two months "weakens the inference of causation").

As such, the District Court was correct in concluding Rayyan could not present evidence to establish a retaliation claim, and its ruling should be affirmed.

**III.    The District Court was not required to "treat as true the facts alleged by Plaintiff-Appellant Rayyan".**

Rayyan asserts as Statement of Issue 5, without any support or argument, that the District Court erred because it did not "treat as true the facts alleged by" him.  Appellant's Br. at 1.

That is not the standard on summary judgment.  "The *evidence* of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (emphasis added).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be *evidence* on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

The record shows that the District Court properly considered the evidence in the light most favorable to Rayyan when it granted summary judgment in VDOT's favor.

## CONCLUSION

For the reasons stated above, the judgment of the District Court should be affirmed.


Respectfully submitted,

VIRGINIA DEPARTMENT OF
TRANSPORTATION

31

By:   /s/ Liza S. Simmons
             LIZA S. SIMMONS (VSB No 67550)
             Assistant Attorney General
             *Counsel for Appellee*

MARK R. HERRING        Office of the Attorney General
Attorney General of Virginia   202 North Ninth Street
             Richmond, Virginia 23219
SAMUEL T. TOWELL     (804) 371-2265
Deputy Attorney General    (804) 371-2087 (fax)
             lsimmons@oag.state.va.us

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Local Rule 34(A), Appellee states that oral argument is unnecessary as the case can be resolved on the briefs.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,878 words, excluding the parts exempted by Rule 32(f), according to the count of Microsoft Word.

By:   /s/ Liza S. Simmons
            *Counsel for Appellee*

## CERTIFICATE FILING AND SERVICE

I certify that on April 25, 2017, I caused this Brief of Appellee to be filed electronically with the Clerk of this Court using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

I further certify that on April 25, 2017, I hand-filed one copy of this Brief of Appellee with the Clerk of the Court.

By:   /s/ Liza S. Simmons
*Counsel for Appellee*